**UNITED STATES of America**

v.

**Wayne DANIELS, Keith Daniels, and Tyran Daniels**

**No. CRIM. 98–30040–MAP.**

United States District Court, D. Massachusetts.

April 12, 2001.

William M. Welch, II, Andrew Levchuk, United States Attorney's Office, Springfield, MO, for Plaintiffs.

Robert H. Astor, Astor & Minardi, George Nassar, Springfield, MA, Stewart T. Graham, Jr., Hampden, MA, David J. Wenc, Windsor Locks, CT, Perman Glenn, III, Springfield, MA, Mark G. Mastroianni, Springfield, MA, Michael J. Cruz, Law Office of Michael Cruz, Springfield, MA, for Defendants.

*MEMORANDUM REGARDING DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION* (Docket Nos. 233, 234, and 266)

PONSOR, District Judge.

## I. INTRODUCTION

Defendants in this case are charged with offenses arising from their alleged possession and distribution of cocaine base. They have moved to dismiss the indictment on the ground of selective prosecution, alleging that the Government has singled them out for prosecution under federal crack cocaine laws because of their race, while similar white crack offenders are charged in state court. Federal laws carry heightened mandatory minimum sentences for possession and distribution of crack cocaine, while state courts generally impose lesser prison terms. Defendants argue that the Government's enforcement policies have both a discriminatory effect and a discriminatory purpose, and that the indictment should therefore be dismissed.

The court will deny defendants' motions to dismiss the indictment. On the record assembled, defendants have not shouldered the heavy burden they must carry to satisfy the Supreme Court's test for selective prosecution: clear evidence of discriminatory effect and discriminatory intent.

## II. BACKGROUND

These motions to dismiss arise from proceedings in another case pending in this court, *United States v. Tuitt*. There, defendant Michael Tuitt, an African–American charged with cocaine base offenses, sought discovery on selective prosecution by the Government. Tuitt had assembled statistics on racial disparities in the prosecution of crack cocaine defendants in the

city of Springfield between federal and state court. *See United States v. Tuitt*, 68 F.Supp.2d 4, 8–9 (D.Mass.1999).

Tuitt noted that in 1998, the year both he and the defendants in this case were charged, all nineteen crack cocaine defendants indicted in the Western Division of the United States District Court for the District of Massachusetts were African–American or Hispanic. *See id.* at 8. Additionally, Tuitt's counsel reviewed the files of the Western Division in the years 1996, 1997, and the first half of 1999 and found no crack prosecutions against non-Hispanic whites in that period. *See United States v. Tuitt*, 98–CR–30048–MAP, Tuitt's Reply to Government's Supplemental Memorandum, Docket No. 63, Ex. A (Aff. of Myles Jacobson, July 8, 1999). By contrast, Tuitt said, in a four-month period of 1998 in the Hampden County Superior and District courts, 299 crack prosecutions had been commenced, of which 170 were brought against blacks, 99 against Hispanics, and 30 against whites. *See Tuitt*, 68 F.Supp.2d at 8.

In a memorandum dated September 10, 1999, Magistrate Judge Neiman concluded that Tuitt had produced enough evidence of racial disparity in the prosecution of crack cocaine offenses to merit some discovery. *See id.* at 18. The Magistrate Judge found Tuitt's statistics particularly "stark" when compared to the racial make-up of the court's jurisdiction.[1] The Magistrate Judge noted that Tuitt's statistical evidence, by itself, might not be enough to prove the ultimate claim of selective prosecution, but found it sufficiently significant to be considered "some evidence" tending to show the essential elements of an Equal Protection violation. *Id.* at 10.

Based on this, the Magistrate Judge ordered the Government to produce a substantial range of information surrounding the Government's charging decisions from January 1, 1996 through June 30, 1999. The order required disclosure of all federal cases in the Western Division of the United States District Court for the District of Massachusetts charging a cocaine offense and the racial or ethnic identity of each defendant. The court ordered the Government to identify each agency involved in the targeting of cocaine suspects and in their selection for state or federal prosecution, the policies followed in determining where suspects were prosecuted, and a statement of how these policies were followed in practice. Finally, the Government was required to explain how the decisions to investigate and prosecute Tuitt were made and why they complied with the Government's policies. *See id.* at 17–18. The Government followed the Magistrate Judge's order, and the same discovery was then turned over to African–American defendants in a number of similar cases, including this one. *See United States v. Brown*, 98–CR–30046–FHF; *United States v. Collado*, 00–CR–30034–MAP.

Tuitt later moved for additional discovery beyond what Magistrate Judge Neiman had ordered. Most significantly, Tuitt sought disclosure of every cocaine *investigation* in the Western Division from 1996 to 2000, broken down by race, with a further disclosure as to whether the suspect was prosecuted and, if not, an explanation why not. He also sought statistical materials on the race and other demographic characteristics of cocaine users, arrestees, and defendants, and any written

---

1. In Hampden County, with a population of 440,974, non-Hispanic whites made up 78.2% of the population, and blacks 9.8%. In the three other counties in the Western Division, with a combined population of 355,721, the numbers were 93.9% and 2.0%, respectively. *Tuitt*, 68 F.Supp.2d at 9.

policies of federal and state law enforcement agencies regarding the referral of suspects for federal prosecution.

Magistrate Judge Neiman allowed the motion with respect to the policies of the state and federal agencies, but denied it otherwise, and Tuitt moved for reconsideration with this court. After receiving supplementary submissions on how state agencies "present" individuals for federal prosecution,[2] the court denied the motion for reconsideration on the grounds that the assembly and disclosure of the investigatory materials would unfairly burden the U.S. Attorney's Office and could prejudice its enforcement strategies. *See United States v. Tuitt*, 98–CR–30048–MAP, Memorandum of Reasons Regarding Motion for Reconsideration, Feb. 8, 2001, Docket No. 140.

Of all defendants obtaining discovery on selective prosecution, only the defendants in this case have filed a motion to dismiss.

### III. DISCUSSION

■ Claims of selective prosecution begin with a strong "presumption of regularity" over prosecutorial decisions. *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Id.* at 465, 116 S.Ct. 1480. The test for dismissal of a charge for selective prosecution is two-pronged: the claimant must prove that the Government's enforcement technique "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). To show discriminatory effect,

"the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 456, 116 S.Ct. 1480; *see also Ah Sin v. Wittman*, 198 U.S. 500, 507–508, 25 S.Ct. 756, 49 L.Ed. 1142 (1905). To prove discriminatory intent, a defendant must show that the Government pursued its course for the forbidden reason; that is, it "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 608, 105 S.Ct. 1524, *quoting Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

■ To show discriminatory effect in this case, defendants rest on the statistics noted above—that in 1998, 100% of crack defendants in federal court (nineteen) were black or Hispanic, while in a four-month period of that year, 10% of crack defendants in state court were white. Defendants also assert that the federal Government's avowed policy of targeting the Mason Square area of Springfield in 1998, the neighborhood with the highest proportion of black residents in the city, "is discriminatory on its face, and has a discriminatory effect upon ... African Americans." Defendant Tyran Daniels' Motion to Dismiss, Docket No. 233, at 8. Defendants rely heavily on the decision of Magistrate Judge Neiman allowing them discovery. They argue that "[t]he discriminatory effect [is] clear, or the request for discovery would not have met the high threshold showing as laid out in *Armstrong*." *Id.*

Defendants underestimate the standard of proof they must meet here. *Armstrong*

---

**2.** *See United States v. Tuitt*, 98–CR–30048–MAP, Government's Memorandum in Response to the Court's July 21, 2000 Order,

Docket No. 134 (describing process of how cases are "presented" for federal prosecution from state law enforcement agencies).

requires "some evidence" of an equal protection violation for a selective prosecution claimant to obtain *discovery*. *Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480. This is by no means identical to the "clear evidence" required to sustain a motion to dismiss. *Id.* at 465, 116 S.Ct. 1480. Clear evidence that similarly situated defendants of other races were not prosecuted would include some analysis of how the defendants in this case are similarly situated to persons not prosecuted. To be sure, the inquiry does not require defendants to be "identically situated," but there must be clear evidence of similarity. *See Tuitt*, 68 F.Supp.2d at 14–15. Such evidence would include comparison, for example, of the amounts of crack involved in cases with white defendants, their criminal histories, propensity for violence, and any other factors that might justify the higher sentences if they were prosecuted in federal court.

Defendants have presented no such evidence here. On this record, the court cannot compare the levels of culpability of these defendants and any state-prosecuted (or wholly unprosecuted) whites that may exist. As the Government points out, defendants have failed to identify even one white crack offender whom they consider similarly situated to themselves. The record is therefore insufficient to satisfy the first prong of the selective prosecution analysis.

In addition, the record on discriminatory intent is totally blank. Defendants would have the court find "clear evidence" of discriminatory purpose in the allegedly pretextual nature of the Government's reasons for prosecuting them, and in the Government's choice to emphasize enforcement in the Mason Square area of Springfield.[3] The specific defendants in this case were prosecuted, according to the Government, because of the quantity of drugs involved, their criminal history, and their records for violence. As justification for its focus on Mason Square the Government points to the fact that the area had just suffered a number of crack-related murders, an increase in other violent crimes, and an increase in the sale and distribution of crack.

There is no evidence of pretext here. Defendants have not refuted the justifications for prosecuting them federally, which are amply supported by the evidence. Targeting the Mason Square community is also no evidence of Government pretext. Of course, if defendants could show predominantly white neighborhoods suffering from societal ills similar to those in Mason Square that were not targeted federally, that evidence would be relevant. But here, given the problems affecting Mason Square in 1998, it would arguably have been more troubling if the Government had ignored the neighborhood.

---

**3.** Defendants creatively argue that the court should import the "pretext" standard of Title VII into this case. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000). In *Reeves*, the Court held that a showing of pretext alone may, in some cases, get a civil race discrimination claim to a jury—that is, a plaintiff need not always assert something more. *See id.* A showing of pretext alone, however, cannot possibly fulfill the "clear evidence" of discriminatory purpose required for this motion. *Armstrong*, 517 U.S. at 465, 116

S.Ct. 1480. The *Reeves* Court itself noted that a showing of pretext may not always be enough to survive a motion for a directed verdict. *See Reeves*, 120 S.Ct. at 2109. If pretext alone is not always sufficient to allow a reasonable jury to conclude that discriminatory motive was more likely than not, it obviously is not "clear evidence" overcoming the presumption of regularity afforded to prosecutors. *See Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480; *Wayte*, 470 U.S. at 608, 105 S.Ct. 1524.

## IV. CONCLUSION

For these reasons, the court will deny defendants' motions to dismiss the indictment.